Next case, 16-7103. Antoinette Burns, D.O. up for the appellant v. Matthew D. Levy, M.D. at Alt. Mr. Hanan for the appellant. Mr. Shuler for the appellees. Thank you, Your Honor. Good morning. May it please the Court, thank you for hearing our argument in this case. I'm honored to be here. The District Court, in our view, gave insufficient attention to the role played by Jamie Padmore, who was an officer of both the hospital and MedStar. In particular, the role that she played on December 11th and December 12th of 2012. As a prelude to discussing that, there were two offer letters to Lt. Col. Burns for her fellowship. One June 2nd of 2011 on the hospital stationery, MedStar stationery. And then later when she arrived, August 1st of 2011 on the university stationery. And the District Court made no comment on the difference between these two. In fact, in a footnote, the Court suggested that perhaps the August 1 letter was simply an amendment to the June 2nd letter. But it's important to us and important to Lt. Col. Burns that both of these letters offered her the very same fellowship. And these offer letters resulted in her beginning her fellowship and coming under the tutelage of defendant Dr. Levy. And after difficulties with Dr. Levy on April 3rd of 2012, and again this is a prelude to the involvement of Jamie Padmore, she was brought in and Dr. Levy and Dr. Nelson gave her a letter of April 3rd of 2012 dismissing her, and this is significant in the first sentences, dismissing her from, quote, research fellowship agreement with Georgetown University Medical Center and dismiss you from the Community Pediatrics and Child Advocacy Fellowship Program. It's important to us to highlight those two different programs that are both identified in this initial dismissal letter that were actually given to Lt. Burns on April 3rd of 2012 because she subsequently resigned her fellowship and Dr. Nelson accepted her fellowship in a letter of December 11th of 2012 that we know was created by the intellectual author of what we call the dual fellowship theory, Jamie Padmore. Before we get to Ms. Padmore, the centerpiece of your concern is the summative assessment that came out and how it described her conduct. Yes. And that summative assessment was requested by and sent to the Air Force, correct? Correct. The Air Force asked in a verification form sent out for the hospital to report by filling in some blanks, one of which was whether she was the subject of any discipline, to which Dr. Levy answered yes. And there had been a previous inquiry by both Colonel Brow and Colonel Tankersley asking for specific explanations as to why the termination took place. There was no sharing with them at any point in time that there was some sort of dual fellowship. I'm not going to a dual fellowship. What I'm trying to figure out here is if the alleged harm is that after there were the exchange of letters and she withdrew from the fellowship, MedStar sent a letter to the Air Force that contained a final summative assessment. Yes. But the Air Force, which was a party to these contracts, asked for that assessment. I agree that the Air Force asked for particular. It was entitled to that assessment. They asked for it before her termination. Correct. I agree with that. Right, JA-421. They say that however this gets resolved, we're going to need a final summative assessment. So they had a right to that information as a matter of these contracts, correct? They had a right to the information. That's correct. So MedStar had to send it to them. MedStar did not have to send to them what they sent to them. They had to send them an honest summative assessment. Well, that's a determination that the district court made that we believe is a determination that must be made by a jury. Whether they had to send it or whether it was honest? They had to send it. Whether it was truthful. Okay. Whether it was truthful and made with malice, right? That's correct. Have you put into the record material from which a court could say that it was made with malice? Put aside the question of the assertion that she was dismissed, the details of her conduct at the hospital. Malice is quintessentially a factual issue for determination by the jury. And in this particular case, the district court looked at the record, plucked out of it some benign information, and the district court described the language used by Dr. Levy in the assessment as being within the realm of acceptable professional language under the standard of the mosque. If you're saying that's irrelevant, I tend to agree with you. But... Well, there's a panoply of contested material facts, probably about 116 that we presented to the district court in response to Georgetown's assertion that everything that was contained in that summative assessment was true. And the record of the falsity of the information that was included there that we made in the district court is so lengthy that in our brief, Your Honor, pardon me, but we referred the court to that contest of material facts. And the problem that Your Honor has now is that the district court didn't make any findings of fact on the particular components of the summative assessment. I didn't see in your brief any effort to persuade us that the facts in favor of your client were so clear that one could infer, a jury could infer, malice by the hospital. The explanation for that, I suppose, is that the argument that was made by Georgetown was fairly benign, and the court's treatment of it was fairly benign. And the extensive nature of the contest over this, it went on for pages and pages and pages in the motion for summary judgment. And this court, I think in fairness to the position that we took on behalf of Lieutenant Colonel Burns, this court is in the same position as the district court in determining the truth or falsity, the malice or not, of the information contained there. If the district court didn't do it, I apologize to this court, but the district court has basically left to this court the responsibility of trying to go through that and determine whether there's no fact in dispute. Well, it's left to you to show it to us. I had thought part of your argument was that the whole concoction, as you would say, of the termination letter from MedStar, that it was written the day after she resigned, but then backdated and never served on anybody, that that was the predicate or the starting point for an inference of malice that they seem to be creating post hoc documents. Absolutely. And that's just your characterization, though. That's obviously for them or a jury to address. Absolutely, and it's important to understand that the summative assessment is, at least from the standpoint of the district court's assessment of the niceties of the legal documents here, that this is on the MedStar stationary, the summative assessment, and it indicates that she was dismissed because of academic performance. Academic performance is part of the obligation of the university under the dual fellowship theory. It has nothing to do with MedStar. And their position seems to be that MedStar had the right to report to the Air Force that Lieutenant Colonel Burns had been subject to discipline and was dismissed because there had to be some relationship between MedStar and Lieutenant Colonel Burns. If MedStar has the right to report that she has been dismissed from the program that the hospital operates, then how could there not be an obligation between MedStar and Lieutenant Colonel Burns to treat her fairly, to provide her with due process according to the Accreditation Council of Graduate Medical Education, to insist, as our expert Matthew Blaschke indicated, someone who's quite distinguished in this area, to insist that if you're going to do a summative assessment at the end of the day, then what you do during the course of the fellowship training must also comply with the ACGME standards by giving Lieutenant Colonel Burns intermediate feedback on her performance and an opportunity, quite frankly, to even have input into the summative assessment. I'm quite surprised, quite frankly, that the district court judge who's quite experienced in medical education cases didn't recognize that Dr. Blaschke's opinion about due process within the medical education program was so important in considering what the facts were in this case and what the standards were for determining the motion for summary judgment. Thank you. We'll hear from the other side now. Good morning, Your Honors. May it please the Court. I would like to start my argument with comments on two points in Dr. Burns' reply brief. First, as to the defamation counts, MedStar and Dr. Levy fully agree with Judge Kolarkatelli that common interest privilege applies and bars the defamation claims. That said, they also argue that peer review statute of the District of Columbia is an express policy of the District of Columbia government and should apply first as a threshold decision point in cases like this, which clearly implicate peer review. Does it apply when it's unclear whether common interest and peer review even apply when the party getting the information is itself a party to the contract, has a contract right to that information? Does it still apply? Yes, Your Honor. It's not a question of contract, in my view. It's a question of the graduate medical education standards, which suggest peer review in all matters. In fact, I would say there was an obligation on MedStar's part, not a right, but an obligation to provide peer review information to the Air Force whether or not MedStar was a contractual party with the Air Force, because that's an expectation within graduate medical education. And then the statute, in turn, offers protections for those who participate in peer review because of the important public policy behind having accurate information about medical professionals and other care providers. I get that. It's a little different animal when you have someone, the military, sending someone for education as part of their active duty, that the prime party to this is actually the Air Force, not Dr. Burns. And so it is their contract, their fellowship that she's doing at their direction as part of her education. And I'm trying to figure out whether you've seen prior cases that involve active duty military graduate students and the transmission of information between the educators and the military, which is itself the prime party to the contract. I haven't, Your Honor, but in the testimony that was taken from the Air Force, former Air Force officers, they retired by the time they were deposed, they talked about it as being standard operating procedure for them to request from the training institution information about the officer candidate. Partly that was because they require it for their medical education, and partly it's because the officer is assigned to the airport institution for training, so they're no longer under military supervision at the time when they're performing those services and getting that training, so they want input from the institution for purposes of their documentation, of their own internal record keeping. The oddity here is, as I understand your argument, you're saying that her resignation, her retroactive resignation, nullified any obligation on your part to afford her due process, which doesn't seem to me you're otherwise contesting that she would have, and in university settings, at least in my experience, there normally would be that opportunity. But you're saying, no, that's all washed away because she resigned. So the question in my mind is, why doesn't that retroactive reservation nullify whatever right you thought she had to pass on negative assessments that had not been gone in pursuant to due process? Your Honor, there are two answers to that, and it goes back to the fact that there were two institutions involved, one of which had a contractual agreement with Dr. Burns, and that was Georgetown University. That's the contract from which she resigned, and whatever due process rights she had in that agreement, first Georgetown thinks were satisfied because it had a right to dismiss her, fairly or unfairly in terms of others' view of due process, but the contract expressly allowed it to dismiss her without process under certain circumstances. And at the time of the dismissal, Georgetown believed that that clause had been triggered. That subsequently gets washed out, Your Honor, because she resigns from the agreement with Georgetown. That leaves MedStar in a different setting than Georgetown. MedStar offers process to medical personnel through its house officer's manual, and that includes those who are in training. And, in fact, MedStar offered Dr. Burns due process, and Dr. Burns' expert- After the fact, due process. Which is what their manual provides for. It is always after the fact. I understand that my learned opponent talked about Dr. Blaschke talking about process in advance. That is not required by ACGME standards. This fellowship was not subject to ACGME standards in the first place, because pediatric fellowships are not, which Dr. Burns' expert agreed with. But, nevertheless, they offered her, within three weeks after, they offered her due process as a post-dismissal review, and she declined. Dr. Burns' expert- Just to be clear, the they there is MedStar or Georgetown? MedStar. Dr. Burns' expert admitted in his deposition that the process offered by MedStar met the applicable medical standards for the accreditation body. That's at appendix page 554 at paragraph 155 in the transcript site's reference. MedStar's expert agreed, and Dr. Burns opted not to invoke that. Did her relationship, however it's characterized with MedStar, terminate at the same moment her relationship with Georgetown terminated? Or is your theory that they separately terminated? Your Honor, they were terminated at the same time, and that would have been at the April 3rd meeting with Dr. Burns, where she was presented with the original notice of termination. And that notice of termination issued by Georgetown specifically referenced both the research fellowship agreement- Do you agree that there's one fellowship here as well, not two? Yes, Your Honor. There was an agreement with Georgetown to be placed into a fellowship training program that included two components, one of which was the Masters of Public Health, which was offered by George Washington University, and then there was the clinical aspect, which was going to be- where she was going to be placed within the clinic at MedStar, and MedStar was going to supervise her for that. So why then, eight months later in December, did MedStar feel obliged to prepare a letter terminating her, and including in that letter all the negative information? She says as follows, you obviously do not. That is the center of this case. Because MedStar's position, meaning that she had been terminated from her position within the clinical training program that it operated, had been covered by the initial letter prepared by Georgetown and given to Dr. Burns on April 3rd. When Georgetown subsequently made a decision to allow Dr. Burns to resign from her research fellowship agreement, that did not include MedStar and MedStar's dismissal of her from the medical training program. So it had to- So suddenly then now there's two things, two fellowships. That doesn't- that seems- Well, not two fellowships. And then if you're doing the- then date the letter honestly. Date it December, not backdate it to April and serve it on somebody. From MedStar's position, it never changed. Dr. Burns didn't ask to be allowed to resign. She didn't resign from the clinical- Well, you just said it was one fellowship. She resigned from the one fellowship. She didn't know that suddenly- or not suddenly, shall I say eight months later, eight months after the April termination, that it was going to suddenly get divided into two with two different letters coming out with the very information she was trying to stop. Well, she also didn't leave the program at George Washington University. There were components of her training that she was- No, you're not representing GW, right? I am not. I mean, that apparently- no one's fighting about whatever happened with GW. Which is my point, Your Honor, is that if Dr. Burns somehow perceived this to be a unified whole- She figured Georgetown and MedStar were the unified whole and you're the one- I thought you had just said to me, and I'm sorry if I misunderstood, that you yourselves considered it a single fellowship and that when one terminated, the other terminated instantaneously. And that's what the agreements say. There was a research fellowship agreement that Dr. Burns entered into with Georgetown University and which Georgetown University had an understanding with, with her Air Force Training Command. And both of those agreements contemplated that Dr. Burns would participate in a clinical program offered by MedStar as part of her research fellowship agreement with Georgetown University. So, in effect, Georgetown turns to MedStar and says, we have a fellow, we would like you to put her into your training program through the children's clinic. MedStar does so. It has an independent obligation as a medical training facility to have someone in that program subject to the rigors of academic medical training. That's what the revised, or the second April 3rd letter represents, is Georgetown's notification, or excuse me, MedStar's notification, that Dr. Burns has not completed that program. Was never sent to anybody. They had this great obligation to do it, but didn't send it to anybody. Well, Your Honor, that was not by intent. It was by inadvertence. Well, that sounds like a fact allegation. But the reality is that this thing didn't materialize until, I take it, at least there's grounds for a juridic term, there's factual allegations here, that it was drafted the day after she withdrew from her fellowship with Georgetown. But then backdated eight months. I wouldn't say backdated, Your Honor, because it was essentially the same letter as was issued. It was written in December and dated in April. It was signed in December with an April date. I agree with that, Your Honor. Was it not written by them? When did they write it? They wrote it after the Georgetown University made its decision that it was going to release Dr. Burns. I get that. I thought I saw on the record that it was written in December, the day after she withdrew. Yes, Your Honor. I'm sorry. I was trying to say that. Okay. So, Your Honor, the perspective that Georgetown and MedStar have on that is that each institution was free to make a decision, as George Washington would have done, with respect to Dr. Burns' position with him. Georgetown honored her request. That doesn't make sense. You don't mean to suggest that she could have continued once she resigned? Once the original resignation? She's done. MedStar's not going to continue her after she's resigned with the university, right? MedStar had already dismissed her. It dismissed her in April, as did Georgetown. Georgetown agreed to allow her, instead, to resign from her agreement, which is what she asked. That's how her letter was phrased. And Georgetown University responds in kind. And if you look at Dr. Burns' letter— Are you saying that resignation arrangement has no effect on MedStar? Yes. Has no effect on MedStar? MedStar had already dismissed her. MedStar did not need to take any further action. But the dismissal, JA-166, rose or fell with what Georgetown did. And so why wouldn't the withdrawal do the same thing, rise and fall with what Georgetown did? You're not completely separate entities like GW here. The letter that is issued to Dr. Burns, the original letter in April, which is given to her in real time, references both the Georgetown research fellowship agreement and the program in which Dr. Burns was placed by Georgetown with the consent of MedStar. So it's dismissing her from both of those at the same time. At the point where Georgetown decides it's going to allow Dr. Burns to resign from the research fellowship agreement, that leaves in place because she didn't, among other things, she did not ask to be released. She consciously phrased her letter, was her testimony, to match the description in her research fellowship agreement with Georgetown, which does not reference the second clause of the original April 3rd letter referencing her dismissal from the clinical training program with MedStar. But doesn't the agreement between the university and the hospital provide that the, well the agreement at least terminates when the arrangement between the university and the fellow terminates for any reason? I think that's right, Your Honor. So was there anything there at the point where the relationship between her and the university terminates? Well that relationship terminates on April 3rd. The parties recast it in December. Oh yeah, that it un-terminates, right. But even at that point in December, the request from Dr. Burns, which she dated April 3rd, even though she gave it to Georgetown in December, is to be effective on April 3rd, the date of the original dismissal from both the research fellowship agreement and the training program. But the original agreement said, and again, J166 says that the MedStar agreement terminates immediately, absent express agreement to the contrary upon a termination of the arrangement between the university and the fellow. And so there was no express agreement to the contrary that the MedStar one would go forward in any way. So it was rising or falling with Georgetown, correct? Yes, Your Honor. And so you would have had to have an express agreement to the contrary for her withdrawal from Georgetown, not to effectuate a withdrawal, a re-termination, a withdrawal of what she did, her relationship with MedStar. Well I think they're co-terminants, Your Honor, and that aside... I think that's her point. That aside, it doesn't change the fact that what we'll really hear about today is the fact that there was a final summative assessment issued, which essentially has the same facts and information in it as was in the termination letter, the notice letter to Dr. Burns that we acknowledge was never delivered to her, even though it was essentially the same facts that were in the original April 3rd letter, which was. So what we'll really hear about is the final summative assessment, which was the report to the Air Force. So that's what Dr. Burns argues is defamatory to her and breached the agreements with her, was the reporting to the Air Force and caused her harm. That would have happened irrespective of the manner of termination or when it was effected. Who runs the kids' mobile medical clinic? MedStar does. MedStar. So her letter did reference that. Her letter, JA 103. I thoroughly enjoyed providing clinical care to pediatric patients at the kids' mobile medical clinic. It's a pleasure to do all this, but I've got to move on. But that's not what she asked to be released from, Your Honor. She asked to be released from her arrangement with Georgetown and... With her one fellowship. From her one fellowship. From a fellowship which included a training component at MedStar. From her one fellowship. You agreed there's one fellowship here. Yes, Your Honor. Okay. There was a fellowship agreement through which she was placed at MedStar in the clinic. But she was never a MedStar employee? She was not, Your Honor. She was a Georgetown University employee, and that is the Georgetown employee agreement that she had with MedStar to allow her to have privileges. Okay. Any questions? Thank you very much. I'm over my time, Your Honor. Yes, we'll give you two minutes. Thank you, Your Honor. We'll give you two minutes if you want. Did you have any more points or are you done? I do. I'm sorry. I'm sorry. I didn't understand the court. I just have a few. I think the colloquy that we just witnessed is a perfect example of why this is a case for the jury. And Judge Williams, the answer to the verification form, yes, Lieutenant Colonel Burns has been disciplined, is false based upon the admission that you heard here today that she was originally dismissed from both programs on Exhibit 48. And that is the dismissal, what was then retracted when she resigned. I'm sorry. What page are you holding up? It's our Exhibit 48, and it is the April 3rd, the real April 3rd, 2012 letter that was on George Washington University Medical Center Stationery. Georgetown. Not George Washington. The university that dismissed her from the research fellowship and the community pediatrics and child fellowship program. I'm sorry. Pediatric program. You're not relying on that letter, because to the extent that that letter is maintained in effect, the answer that she was disciplined is completely valid. This was the removal that was initiated on April 3rd, actually on April 3rd, that she resigned from and her resignation was accepted. Now, they kept secret from Lieutenant Burns. You're talking about the December, April 3rd letter? No, I'm talking about the real April 3rd letter, which refers to both programs. As Mr. Shuler said, he just said that by this letter, she was dismissed from both sides of the fellowship, the clinical and the academic side of the fellowship, but they kept secret from her the idea that somewhere down the road they were going to separately dismiss her from the MedStar fellowship. What is the impact? To the extent that your defamation claim rests on the hospital saying that she was dismissed and you, I thought, argued that in truth and in fact she was not dismissed because the dismissal was nullified. Oh, yes. You now seem to be making an argument under which MedStar was perfectly correct in saying she was dismissed. I'm sorry, Your Honor. It's this letter that was rescinded. This was the agreement that she was subsequently allowed to rescind by her resignation that was backdated to the same date. To what extent does that rescind, at least I would think the question is, to what extent does that decision either prevent the hospital from responding to the Air Force as to how the clinical relationship went and whether it makes it not the case when the hospital says she was dismissed. It's our position that when Lieutenant Colonel Burns sent in her letter resigning as a consequence of being sent the real April 3rd letter, that constituted a resignation from the fellowship and all of its components. And what Mr. Shuler has told the court is that secretly, Georgetown apparently was harboring an intention at some point down the road to dismiss her again. I'm sorry, when you say Georgetown, you mean the hospital? MedStar. MedStar, yes. To dismiss her again, which they did simultaneously with accepting her resignation, except they kept it in their pockets and backdated it. That's the height of perfidy in my view. And it's summarized in our Exhibit 58, which is the letter that Jamie Padmore sent to Colonel Tankersley on December 12, 2012. Can you give me a J.A. page for these things? What J.A. page is that on? This is Exhibit 58 to our motion, our opposition to the motion for summary judgment. You're looking for a page in the record. It's A443. That will help.  Thank you very much. Thank you, Your Honor.
judges: Millett, Edwards, Williams